Argued and submitted January 20, decision of the Court of Appeals and judgment of circuit court affirmed July 12, 1988

CITY OF PORTLAND,
*Petitioner on Review,*

*v.*

TIDYMAN et al,
*Defendants,*
*Third-Party Plaintiffs,*
*Respondents on Review,*

*v.*

HOOVER ENTERPRISES, LIMITED et al,
*Third-Party Defendants.*

CITY OF PORTLAND,
*Petitioner on Review,*

*v.*

SMITH et al,
*Defendants,*

BEDROSIAN et al,
*Defendants-Respondents on Review.*

CITY OF PORTLAND,
*Petitioner on Review,*

*v.*

MAKAROUNIS et al,
*Defendants,*

C & H CATTLE COMPANY,
dba Cal's Bookstore,
*Defendant-Respondent on Review.*

(TC A8305-03194, A8305-03190, A8305-03192;
CA A34453; SC S34556)

759 P2d 242

Paul C. Elsner filed a brief and appeared on behalf of petitioner on review.

Rex Armstrong filed a brief and appeared on behalf of respondent on review C & H Cattle Company, dba Cal's Bookstore. Respondents on review John Tidyman, The Flick Bookstore, Albert Bedrosian, and Theland, Inc. did not appear and did not file briefs.

LINDE, J.

Gillette, J., concurred in part and specially concurred in part and filed an opinion.

Jones, J., specially concurred and filed an opinion.

## LINDE, J.

In May 1983 the City of Portland brought consolidated actions to enjoin, as a "public nuisance," defendants' operation of so-called "adult bookstores" at locations where a city ordinance bans "adult bookstores" as defined in the ordinance. Each defendant asserted that the ordinance is an invalid restraint on free expression under Article I, section 8, of the Oregon Constitution. The circuit court agreed and entered judgment for defendants in November 1984, and the city appealed. In September 1987 the Court of Appeals, being evenly divided, affirmed the circuit court's decision without opinion, *City of Portland v. Tidyman,* 87 Or App 488, 742 P2d 1202 (1987), and we allowed the city's petition for review. For the reasons that follow, we affirm the judgment of the circuit court.

### I. THE PORTLAND ORDINANCE

The ordinance at issue undertakes to deal with "adult businesses" by requiring them to locate at least 500 feet distant from any residential zone or any public or private school and, in some zones, at least 1000 feet from any other adult business. "Adult" in contemporary society and commerce (not to say culture) has come to be equated specifically with sexual conduct and erotic entertainment, and the ordinance includes "adult bookstores" among other "adult businesses" such as theaters, "adult arcades," cabarets, "adult paraphernalia shops," and "relaxation treatment" enterprises that are characterized by an emphasis on nudity or sexual activity. Portland Ordinance No. 155387, Portland Municipal Code § 33.80.030.[1] The city adopted its *cordon sanitaire* approach to

---

[1] The entire ordinance is too long to set out in full here. The following quotations suffice for this opinion:

"ORDINANCE No. 155387

"* * * * *

"The City of Portland ordains:

"Section 1. The Council finds that:

"1.  Over the course of several years the City has added regulations pertaining to the location of establishments primarily offering such services or products as nude modeling, sex counseling, sexy reading, sexual encounters, relaxation treatment, adult books, adult films, live sex shows, and nude dancing.

"2.  These businesses can be characterized generally as emphasizing

the sex business in 1983 from a Detroit ordinance that had survived a First Amendment challenge in the United States Supreme Court, although without a majority opinion. *Young v. American Mini Theatres,* 427 US 50, 96 S Ct 2440, 49 L Ed 2d 310 (1976).

Meanwhile, however, this court in *State v. Spencer,* 289 Or 225, 611 P2d 1147 (1980), and *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982), spelled out an independent analysis under Article I, section 8, Oregon's guarantee of free expression. Article I, section 8, provides:

> depictions or exhibitions of sexual activity, nudity, or as being centered on relaxation treatment and related activities as defined in Chapter 44 of Title 14 of the City Code.
>
> "* * * * *
>
> "9. In adopting locational restrictions on adult bookstores and adult theaters, the City found that there is an inherent incompatibility between such uses as adult bookstores or adult theaters and residential zones because these businesses adversely affect the quality and stability of nearby residential and commercial areas.
>
> "10. In adopting Ords. No. 153063 and 153062, the Council found that the clustering of adult bookstores, adult theaters, and/or relaxation treatment and related businesses tended to create or accelerate blighted conditions and make areas more resistant to the City's economic revitalization efforts.
>
> "* * * * *
>
> "NOW, THEREFORE, the Council directs:
>
> "* * * * *
>
> "33.80.020 Purpose. This chapter regulates the location and spacing of adult businesses. These regulations are intended to reduce conflicts between adult businesses and residential uses. They also are intended to protect the city from the blighting impacts of concentrations of adult businesses.* * *
>
> "* * * * *
>
> "33.80.050 Location Restrictions.
>
> "(A) Adult businesses in a C3, C2, C1, MX, M3, M2 or M1 zone shall not locate within 500 feet of any residential zone, including the farm and forest (FF) zone, or within 500 feet of any public or private elementary, junior high or high school.
>
> "(B) Adult businesses as defined in Section 33.80.030, are prohibited in all zones except C3, C2, C1, MX, M3, M2, and M1 zones.
>
> "33.80.060 Spacing Restrictions. New or relocating adult business as defined by Section 33.80.030, shall be located in conformance with the following minimum spacing requirements:
>
> "(A) Within C1 and MX zones no adult business shall locate within 500 feet of any existing adult business.
>
> "(B) Within C3, C2, M3, M2 AND M1 zones, no adult business shall locate within 1,000 feet of any existing adult business."

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

*Spencer* and *Robertson* and their sequels[2] emphasized that the clause is addressed to lawmakers at the time they consider making a law and forbids the enactment of a law directed in terms against any subject of speech, writing, or printing that cannot be shown to fall within an old or modern version of a well-established historical exception that the constitutional guarantees demonstrably were not meant to displace. This analysis was argued before the circuit court and on appeal. In 1987, while the Court of Appeals was considering the appeal, this court, finding no such well-established and demonstrably preserved historical exception for "obscenity," invalidated laws against disseminating obscene material and against telephonic harassment that were written in terms describing the forbidden content of speech or printed material. *State v. Henry,* 302 Or 510, 732 P2d 9 (1987); *State v. Ray,* 302 Or 595, 733 P2d 28 (1987).

*Henry* and *Ray* were criminal prosecutions, and the court noted that they did not involve other forms of regulation:

"We do not hold that this form of expression, like others, may not be regulated in the interests of unwilling viewers, captive audiences, minors and beleaguered neighbors. No such issue is before us. But it may not be punished in the interest of a uniform vision on how human sexuality should be regarded or portrayed. We also do not rule out * * * reasonable time, place and manner regulations of the nuisance aspect of such material or laws to protect the unwilling viewer or children. Again, no such issue is before us. However, no law can prohibit or censor the communication itself. In this state any person can write, print, read, say, show or sell anything to a consenting adult even though that expression may be generally or universally considered 'obscene.' "

*State v. Henry,* 302 Or at 525. *See also State v. Ray,* 302 Or at 602 (Linde, J., concurring) (laws might provide a compensatory rather than prohibitory remedy for injuries to "person,

---

[2] *See, e.g., State v. Garcias,* 296 Or 688, 679 P2d 1354 (1984); *State v. Moyle,* 299 Or 691, 705 P2d 740 (1985).

property, or reputation,"[3] by "abuse" of rights under Article I, section 8.) The city defends its ordinance as the kind of reasonable regulation of the "nuisance aspect" of sexually explicit material in the interests of "minors and beleaguered neighbors" left open in the quoted paragraph.

## II. AUTHORITY AND COVERAGE

The city's briefs below and in this court commendably deal with subconstitutional points of city authority and the text of the ordinance before addressing its constitutionality. *See e.g., DeFazio v. WPPSS,* 296 Or 550, 555, 679 P2d 1316 (1984); *Planned Parenthood Assn. v. Dept. of Human Res.,* 297 Or 562, 564, 687 P2d 785 (1984); Carson, *"Last Things Last": A Methodological Approach to Legal Argument in State Court,* 19 Willamette L Rev 641 (1983).

■ As to its authority, the city cites a provision of its charter that empowers the city to regulate the "use and management of buildings," Portland City Charter § 2-105(a)(35). This charter authority concerns the physical use, maintenance and management of buildings for various purposes, including merchandising, but not the selective regulation of the kind of printed materials sold by a bookstore. But the next paragraph provides authority

> "to regulate, restrain and to provide for the exclusion from the city, or any part thereof, of trades, occupations or businesses which are offensive or may in the opinion of the Council create or constitute a nuisance, and to regulate uses of land and structures within the city."

Portland City Charter § 2-105(a)(36). To construe this paragraph as insufficient to authorize the ordinance before us would unjustifiably narrow the city's powers under its charter. *Cf. DeFazio v. WPPSS, supra,* 296 Or at 569-70. The charter provides ample authority for Ordinance No. 155387, subject to constitutional limitations.

As to the text, the ordinance restricting the location of "adult businesses" defines an "adult bookstore" to be

---

[3] Article I, section 10, of the Oregon Constitution guarantees that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." The responsibility for "abuse" reserved in Article I, section 8, refers to nonpunitive responsibility to the injured party. *See Hall v. The May Dept. Stores,* 292 Or 131, 637 P2d 126 (1981); *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979).

"an establishment having, as substantial or significant por-
tions of its merchandise, items such as books, magazines,
other publications, films, video tapes, or video disks which are
for sale, rent, or viewing on premises and which are dis-
tinguished by their emphasis on matters depicting specified
sexual activities * * * and/or nudity [as defined elsewhere in
the city code.]"

Portland City Code § 33.80.030(A). An obvious issue under the
text is whether a "substantial or significant portion" of the
merchandise of an establishment that sells films and publica-
tions along with noncommunicative materials or that sells
some materials covered by the definitions among other, non-
erotic films or publications, means "substantial or signifi-
cant" in isolation or proportionately, and whether it is
measured by numbers of items in stock or by their sale or
rental value. Defendants stipulate, however, that the ordi-
nance covers their establishments. This brings us to the con-
stitutional issue.

## III.   CONSTITUTIONALITY

Under Article I, section 8, of the Oregon Constitu-
tion, as applied in *Henry* and *Ray,* depiction of the "specified
sexual activities" or "nudity" incorporated by reference in
section 33.80.030(A) could not be outlawed entirely. The city,
however, has placed the geographic restriction on "adult busi-
nesses" among its planning and zoning ordinances, and it
maintains that the restrictions are the kind of "reasonable
time, place and manner regulations" that the court did not
"rule out" in the quoted passage from *Henry.*

The ordinance is a business regulation more than a
conventional land use ordinance, because the same structure
devoted to essentially the same kind of use, retailing reading
or viewing materials or showing films, becomes a prohibited
use under the ordinance simply because the quantity of its
"adult" merchandise increases from a minor to a "substan-
tial" or "significant" portion. Defendants contend that
reasonable regulation of the location, physical facilities, or
time and manner of operating bookstores cannot discriminate
among such stores by the content of the books, periodicals, or
other communicative materials they purvey. The city, in turn,
argues that its distinction is based not on the content of

"adult" material as such but on the effects caused by "adult businesses" in their locality.

We note at the outset that the obstacle to the city's distinction is not the constitutional guarantee of equal privileges and immunities, Article I, section 20,[4] but the guarantee of free expression, Article I, section 8. If free expression within that guarantee were not involved, "adult" businesses could not insist that they must be treated exactly like any other business, not, at least, without a showing of being singled out for an impermissible motive.[5] The constitution does not limit locational regulation to broad categories of structures or enterprises; if a city chooses to allow ice cream stores or beauty shops in residential areas but not taverns or dental offices, no guaranteed right like free expression is invaded.

Thus the city could regulate the location of a business that sells other merchandise, "adult" or otherwise, even if it purveys communicative materials, as long as selling such other merchandise is not permitted at the location. A grocery store gains no privilege against a zoning regulation by selling *The National Enquirer* and *Globe* at its check-out counter. The same applies to "adult businesses" that sell other merchandise besides books, pictures or records. Even structures and activities unquestionably devoted to constitutionally privileged purposes such as religion or free expression are not immune from regulations imposed for reasons other than the substance of their particular message. Many regulations are not impermissible laws "restricting the right to speak, write, or print freely on any subject whatever," although they can be impermissibly applied in individual cases.

A regulation is not always unconstitutional because it restricts one's choice of a place or time for self-expression or religious practice, when that is not the object of the regulation. The concern may be with the medium, not the message, as

---

[4] Article I, section 20, of the Oregon Constitution provides: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." For discussion of U.S. Supreme Court cases on this question, see Karst, *Equality as a Central Principle in the First Amendment*, 43 U Chi L Rev 20 (1975).

[5] *Cf. Yick Wo v. Hopkins,* 118 US 356, 6 SCt 1064, 30 L Ed 220 (1886) (prohibition on unlicensed use of wooden buildings for laundries denied equal protection under Fourteenth Amendment because directed against Chinese laundries).

when park regulations ban fireworks even for a Fourth of July celebration. To decline an exception from a land-use regulation for a theater, a printing plant or a church[6] differs from attempting to restrict prayer meetings, film showings or desktop publishing in a residence, or in turn from enforcing safety codes or parking restrictions when a residence is so used. Similarly, it can make a difference whether a city imposes a permissible limitation on all location, time, manner, intensity, or invasive effect of some communicative activity (for instance, zones out all bookstores along with other commercial shops, or restricts all use of soundtrucks in residential areas to specified hours) or whether it concludes that limitations of number, frequency, density, or duration suffice to serve the city's regulatory objective. This court has never held that an otherwise valid restriction must cover all or nothing, for instance that a city may not make evenhanded exceptions to an otherwise valid restriction against placing signs on utility poles, obstructing traffic for a civil rights commemoration, or using soundtrucks during a political campaign without having to make the same equally available to supporters of sports teams or to commercial advertisers.[7] But that does not help the city here. This ordinance does not allocate priorities in intermittent and temporary exceptions or in use of scarce

---

[6] *See Jehovah's Witnesses v. Mullen,* 214 Or 281, 330 P2d 5 (1958) (denial of a permit to build a church in a residential zone); *cf. Medford Assembly of God v. City of Medford,* 297 Or 138, 681 P2d 790 (1984) (denial of conditional use permit for church school).

As the United States Supreme Court recently stated:

"A law requiring building permits is rarely effective as a means of censorship. To be sure, on rare occasions an opportunity for censorship will exist, such as when an unpopular newspaper seeks to build a new plant. But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse."

*City of Lakewood v. Plain Dealer Publishing Co.,* ___ US ___, 108 S Ct 2138, 100 L Ed 2d 771, 56 USLW 4611, 4614 (1988).

[7] In invalidating an ordinance for excessive discretion in licensing newspaper vending machines, the Supreme Court distinguished selling soft drinks from selling newspapers:

"Newspapers are in the business of expression, while soda vendors are in the business of selling soft drinks. Even if the soda vendor engages in speech, that speech is not related to the soda; therefore preventing it from installing its machines may penalize unrelated speech, but will not directly prevent that speech from occurring."

*City of Lakewood, supra* n 6, 56 USLW at 4614.

opportunities created by the city itself;[8] it is flatly directed against one disfavored type of pictorial or verbal communication.

The city argues that its ordinance meets the test of *State v. Robertson, supra,* because the ordinance "is concerned with the 'effect' of speech, not the speech itself." If the ordinance were so written, it might well be valid on its face and subject only to scrutiny for valid administration; but it is not so written. The "coercion" statute at issue in *Robertson* made the undesired effect an element in the rule itself. What the law forbade was to *compel or induce* another person to unwilling behavior "by means of" specified kinds of threats; the law did not forbid the threats as such. Threats that did not so compel or induce the addressee were not violations of the statute; at most they could be attempts. The Portland ordinance, in contrast, undertakes to prevent what the city believes to be the effects of the trade in sexually explicit verbal or pictorial material by describing the content of this communicative material.

The city attempts to cover this crucial gap by legislative assertions. It prefaced Ordinance No. 155387 with a list of findings, which recited the history of the city's prior regulation of sexually oriented businesses and findings made in earlier years in adopting those regulations. These include that the city earlier "found" adult bookstores and theaters inherently incompatible with residential zones "because these businesses adversely affect the quality and stability of nearby residential and commercial areas," that the "clustering" of adult businesses "tended to create or accelerate blighted conditions," that subsequently "new forms of adult business" not previously defined were able to locate near schools and residential neighborhoods, and that it now was "appropriate and in the public interest to protect residentially zoned areas from the

---

[8] *See, e.g., Metromedia, Inc. v. San Diego,* 453 US 490, 101 S Ct 2882, 69 L Ed 2d 800 (1981) (sustaining partial prohibition of outdoor signs); *Southeastern Promotions, Ltd. v. Conrad,* 420 US 546, 95 S Ct 1239, 43 L Ed 2d 448 (1975) (reversing decision to ban play from city theater for lack of procedural safeguards in making and contesting decision); *Red Lion Broadcasting Co. v. FCC,* 395 US 367, 89 S Ct 1794, 23 L Ed 2d 371 (1969) (broadcast regulation sustained as allocation of limited available frequencies); *compare* the views in *Lehman v. City of Shaker Heights,* 418 US 298, 94 S Ct 2714, 41 L Ed 2d 770 (1974) (sustaining prohibition on political but not commercial advertising in city busses).

conflicts resulting from close proximity to adult businesses" and to protect commercial areas from the reach of the restrictions. Portland Ordinance No. 155387, section 1 (9), (10), (19) and (21).

These "findings" are vague and conclusory. They leave unexplained what is meant by "the quality and stability of nearby residential and commercial areas," by "blighted conditions," and by "conflicts resulting from close proximity to adult businesses," nor do they explain how the presence of an "adult business" causes specific effects that are incompatible with residential zones or blight commercial areas. But the problem is not vagueness or lack of detail in the "findings." They do not purport to be findings of adjudicative facts (for which they are plainly inadequate) nor to be regulatory standards. The problem, indeed, is that they, or more concretely defined effects, are *not* part of the regulatory standards. These findings are only a recital of premises for legislation. As such, their vagueness or concreteness and their past or continued accuracy are immaterial. Their omission would not affect the validity of the ordinance. If legislative findings mattered, drafters merely would busy themselves with inserting whatever prefatory recitals courts have quoted in sustaining similar laws. But lawmakers do not need to find or declare the factual predicates for legislation, unless some special statute requires it, and such a recital gains nothing for the validity of the legislation, though it can sometimes help toward its purposeful interpretation. It is the operative text of the legislation, not prefatory findings, that people must obey and that administrators and judges enforce.

In short, the problem with the city's asserted "concern with the effect of speech," is that the operative text of the ordinance does not specify adverse effects that constitute the "nuisance" attributable to the sale of "adult" materials and therefore does not apply only when these adverse effects are shown to occur or imminently threaten to occur. Rather, the ordinance makes a one-time legislative determination that retailing substantial quantities of sexually oriented pictures and words within the proscribed area will have adverse effects that retailing other pictures and words would not have, and that it therefore can be restricted as a "nuisance" by a law

describing the materials rather than the effects.[9] By omitting the supposed adverse effects as an element in the regulatory standard, the ordinance appears to consider the "nuisance" to be the characteristics of the "adult" materials rather than secondary characteristics and anticipated effects of the store. Such lawmaking is what Article I, section 8, forbids.

## IV. SHOWING THREATENED EFFECTS AT TIME AND PLACE

The foregoing explains why we depart from the direction taken by the United States Supreme Court under the First Amendment.

The Supreme Court itself was unable to reach a majority opinion in *Young v. American Mini Theatres, supra,* which sustained the Detroit ordinance on which Portland's ordinance partly was modeled. The plurality opinion, by Justice Stevens, would allow the city to regulate the location of "adult" theaters and bookstores more restrictively than other theaters and bookstores, though all of them purvey constitutionally protected materials, by assigning a lower degree of constitutional protection to sexually explicit expression than to other types of expression. Justice Powell, concurring, wrote that he was not inclined to agree with the view that nonobscene, erotic materials may be treated differently from other forms of protected expression, but he would sustain the ordinance because it did not significantly close off opportunities to show or to see erotic films. 427 US at 79. He thought that the case could appropriately be decided by the analysis of *United States v. O'Brien,* 391 US 367, 88 S Ct 1673, 20 L Ed 2d 672 (1968).[10] Justice Stewart, writing for four

---

[9] On "causation theory" and pornographic materials generally, see Schauer, *Causation Theory and the Causes of Sexual Violence,* 1987 Am B Found Res J 737 (1987).

[10] The statute sustained in *O'Brien* in fact made no mention of any form of speech or press; it required possession of a selective service card. O'Brien, a protester against American military actions in Vietnam, was prosecuted for noncompliance with the law. The law was enacted when burning draft cards was a symbol of political protest, arguably as a way to inhibit and punish this protest, but the Supreme Court did not find an impermissible congressional motive. The Court therefore sustained O'Brien's conviction. In contrast, the Detroit ordinance, and Portland's, are phrased in terms of restricted content of expression.

In *Young,* Justice Powell's conclusions about unrestricted access related to the Detroit ordinance (sometimes called an "anti-skid row ordinance"), which was designed to scatter adult businesses by spacing them at prescribed distances from each other.

dissenters, saw the issue as one of "selective interference with protected speech whose content is thought to produce distasteful effects," and maintained that "it is in those instances where protected speech grates most unpleasantly against the sensibilities that judicial vigilance must be [highest]." 427 US at 87.

After *Young,* lower courts divided on the factual showing needed before a city could restrict the locations at which otherwise privileged materials could be shown or sold. *See* Weinstein, *The Renton Decision: A New Standard for Adult Business Regulation,* 32 Wash U J Urb & Contemp L 91, 97-102 (1987) (reviewing the cases). The obvious problem is that when a locational restriction is justified by only the secondary effects of showing or selling constitutionally protected materials, the restriction is unconstitutional if the feared effects do not exist.

In 1986, the Supreme Court nevertheless sustained a city ordinance that limited the showing of "adult" films to theaters located within a 520-acre area. *Renton v. Playtime Theatres, Inc.,* 475 US 41, 106 S Ct 925, 89 L Ed 2d 29 (1986). Renton's approach was to concentrate what Detroit sought to disperse. The effectiveness or reasonableness of one rather than the other policy would be immaterial to its validity if constitutionally protected materials were not involved. The majority opinion in *Renton,* however, contained two propositions that differ from this court's decisions under Article I, section 8. The Court stated that a motive to suppress the disfavored expression would not invalidate an ordinance as long as a concern with secondary effects of the expression was predominant. 475 US at 47-48. Also, the *Renton* majority held that the city did not have to show that dissemination of "adult" materials outside the specified zone would have the feared consequences; the city could rely on the legislative findings or the experience of other cities as the basis for its own restrictive law. 475 US at 50-52. Subsequently, the Supreme Court explained that "secondary effects" as used in *Renton* meant something other than the impact of the content of the regulated communication. *Boos v. Barry,* 485 US ___, 108 S Ct 1157, 99 L Ed 2d 333 (1988).[11]

---

[11] *Boos* invalidated an ordinance against signs criticizing a foreign government within 500 feet of that government's embassy. Justice O'Connor wrote for three

Our cases under Article I, section 8, preclude using apprehension of unproven effects as a cover for suppression of undesired expression, because they require regulation to address the effects rather than the expression as° such. The statute at issue in *State v. Robertson, supra,* prohibited causing a harmful effect, coercing another into undesired conduct. The court invalidated the statute for overbreadth, because it specified coercion by "threats," which covered privileged as well as unprivileged speech. 293 Or at 435-36. Similarly, the terms of the statute at issue in *State v. Moyle,* 299 Or 691, 705 P2d 740 (1985), prohibited intentionally causing a harmful effect (alarming another person by threats), and the *Moyle* court found it possible to save the statute by interpreting it to require genuine threats that are objectively likely to be followed by unlawful breaches of the peace. *Id.* at 705. The Portland ordinance, to the contrary, in terms restricts the marketing of the described communicative material, not only the effects of this marketing.

■ The city need not await the actual occurrence of substantial harm to a neighborhood before it invokes a non-punitive, purely locational land use restriction. But when the terms of such a restriction include the specified harm from particular forms of expression, application of the ordinance necessarily requires showing the reality of the threatening effect at the place and time, as stated in *Moyle.* It would not presume the effect by a generalized rule against the substance of the expression.[12]

---

members of the Court:

"Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton.* To take an example factually close to *Renton,* if the ordinance there was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would have been appropriate. The hypothetical regulation targets the direct impact of a particular category of speech, not a secondary feature that happens to be associated with that type of speech."

*Boos v. Barry, supra,* 108 S Ct at 1163, 99 L Ed 2d at 344. Brennan and Marshall, JJ., concurred while reasserting their disagreement with *Renton.* 108 S Ct at 1171, 99 L Ed at 353.

[12] By requiring that the threat of a harm specified in the law be found to exist at the time and place rather than in general, permanent legislation, the restraint on lawmakers stated in Article I, section 8, avoids what one scholar calls "constrained balancing" by judges reviewing "legislative facts." *See* Neuborne, *Notes for a Theory of Constrained Balancing in First Amendment Cases: An Essay in Honor of Tom Emerson,* 38 Case W Res L Rev 576 (1988).

Ordinary legislation faces no such test, because ordinary legislation does not undertake to restrict constitutionally privileged activity. Ordinarily, lawmakers may tackle a perceived problem on any theory of its causes, farfetched or realistic, or by acting on their constituents' beliefs about the causes. Not uncommonly they simply copy a law from other states or cities without making any local diagnosis, particularly if the law has been sustained by a court, as the city did here. The resulting enactment remains law until it is repealed. It remains the law whether or not the diagnosis or the cure ever was realistic, or remains realistic under changed conditions. This principle applies to land use regulations as to other legislation. If retail business is excluded from a residential zone to keep down heavy traffic and noise, the exclusion bars an antique store that attracts only a half dozen quiet visitors a day. But the principle does not permit regulation in the form of a general law "restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever," in the constitutional words.

It is not a technical detail of drafting that such a restriction must specify the proscribed harm and not only the expression that is thought to threaten the harm. The role of the requirement is shown by the history of political, social, and religious issues far more central to the constitutional freedom of expression than the kind of "adult" materials covered by this ordinance. Legislatures often have made (and copied) laws restricting political expression because of consequences feared at the time, and some courts have deferred to those legislative judgments. *See, e.g., Gitlow v. New York,* 268 US 652, 45 S Ct 625, 29 L Ed 1138 (1925) (sustaining "criminal anarchy" law against radical advocacy, adopted a quarter century earlier after the assassination of President McKinley). Later, in *Communist Party v. Control Board,* 367 US 1, 81 S Ct 1357, 6 L Ed 2d 625 (1961), the Supreme Court sustained a statute based on a lengthy recital of congressional "findings" whose truth the Communist Party was not allowed to question, though the facts had changed and continued to change.[13]

Expression that is offensive to many is likely also to

[13] The findings referred to the existence of a "world Communist movement," and the Court dealt with them by stating that their truth or falsity was immaterial because they were used only as a pseudonym for the Soviet Union. 367 US at 112-114.

be seen as harmful, and there is little political incentive to repeal laws made in apprehension of harm from offensive expression when the danger fails to materialize, as those examples show.[14] Thus it is important that the constitutional guarantee restricts lawmakers, as this court noted in *State v. Spencer,* not merely the unconstitutional application of laws. The facts respecting the commercial distribution of sexually explicit materials also undergo continual technological as well as social change. The invention of photography, producing first still and later moving pictures, and of means to print photographs in magazines changed what previously had been a trade in the written word, and the invention of video cassettes playable on television sets has revolutionalized the entertainment market once again. *See* Beaver, *The Awkward Embrace: The Legal Battle Over Obscenity,* 2 Gannett Center J 81, 87-89 (1988) (reporting on wide use of pornographic videotapes); Groskaufmanis, *What Films We May Watch: Videotape Distribution and the First Amendment,* 136 U Pa L Rev 1263, 1284-90 (1988) (describing the rapid proliferation of the medium and some early regulatory reactions).[15] If a law

---

[14] The New York statute at issue in *Gitlow v. New York, supra,* is still on the books, *see* N Y Penal Law § 240.15 (McKinney 1980), as is its federal twin, the Smith Act. 18 USC §§ 2385, 2387. The statute establishing the Subversive Activities Control Board, respondent in *Communist Party v. Control Board, supra,* was "omitted" (not repealed) in view of the Board's cessation of operation on June 30, 1973, due to lack of funding, but the Subversive Activities Control Act remains in effect. 50 USC § 781 *et seq.* Beyond statutes passed in apprehension of danger from offensive expression, Dean Calabresi has written more generally:

"[Some] laws no longer served current needs or represented current majorities. Changed circumstances, or newer statutory and common law developments, rendered some statutes inconsistent with a new social or legal topography. Others were oddities when passed (in the throes of a crisis, or, perhaps, in an experimental spirit that started no new trend in the law). Still others became increasingly inconsistent with new constitutional developments without, for all that, actually becoming unconstitutional. Despite this inconsistency with the legal landscape, however, such statutes remained effective and continued to govern important areas of social concern, because getting a statute enacted is much easier than getting it revised. They remained effective, even though some of them at least could not have been reenacted and thus could be said to lack current majoritarian support; checks and balances still worked, and interests served by these outdated laws could successfully block their amendment or repeal."

Calabresi, A Common Law for the Age of Statutes 19 (1982) (footnotes omitted).

[15] Dean Frank Beaver reports that in Michigan rentals of pornographic video cassettes constitute perhaps 15 percent of all rentals, approaching 40-50 percent on weekend nights, and are economically essential to many rental outlets. Portland's test of "substantial or significant proportion" would appear to make a video store's location unlawful whenever these percentages are reached, although as already stated the

specifies the harm and not only the expression, its valid application depends on demonstrating the specified harm under changing conditions, not on mere apprehension.[16]

## V. CONCLUSION

■ We do not retreat from our statement that the decision in *State v. Henry* did not rule out "reasonable time, place and manner regulations of the nuisance aspects of ['adult'] material or laws to protect the unwilling viewer or children." It is not for us to spell out what such regulations should be, but some illustrative possibilities are obvious. If some effect other than exposure to offensive communication as such is considered a "nuisance," a regulatory law might define the feared effect and, within constitutional limits, provide for administrative prevention proceedings, or for persons within the supposedly threatened area to initiate such proceedings, or perhaps provide such persons with a civil damage remedy if the feared effect actually causes harm. But the regulation must be addressed to whatever the government identifies as the harmful effects accompanying the trade in the material, not only describe the material itself. A law focused on the risk of specified harm leaves it incumbent on government to demonstrate that risk when and where the law is to be applied rather than rest on previous legislative declarations at the time of enactment. The Portland ordinance fails that test.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**GILLETTE, J.,** concurring in part and specially concurring in part.

Justice Linde for the majority has produced an intelligent solution to a pernicious and recurring problem — the

---

test is imprecise.

*See also Virginia v. American Booksellers Assn. Inc.,* ___ US ___, 108 S Ct 636, 98 L Ed 2d 782 (1988) (certifying to state court questions bearing on regulation of bookstores' display of books unsuitable for juveniles but not obscene for adults).

[16] Valid application also must observe the limits on prior restraints on expression. The present case concerns only land use or other rules for the location of relatively long-term undertakings like stores; it does not concern anticipatory prevention of risks from ideas communicated by street speakers, proselytizers, picketers, or parades. *See* Tribe, Constitutional Law 853-56 (2d ed 1988) (citing U.S. Supreme Court cases).

question of how a community that knows that adult businesses cause undesirable effects apart from the content of their wares can regulate the businesses to curb the effects. I agree with much of it. However, there are portions as to which I have reservations I believe it appropriate to raise.

I shall first set out the areas in which I agree with the opinion. I agree that the ordinance is aimed by its terms at protected activity. I also agree that, in such cases, any ordinance must have what this one does not — a statement of one or more effects, aside from the protected act of communication itself, that the city desires to limit or eliminate. We call ordinances of this kind "reasonable time, place and manner regulations." Agreement with the two foregoing propositions means that I also agree with the disposition made in this opinion, because the two propositions establish that the ordinance cannot stand. My reservations have to do with two other propositions offered by the majority.

The first of these propositions is that the ordinance is unconstitutional in its entirety. The ordinance combines two different concerns — a concern with locating adult businesses within a certain distance of a residential neighborhood or each other, and a concern with locating adult businesses near schools. I agree that the ordinance cannot stand as to the former concern; I am unsure as to the latter.

Treating the portion of the ordinance restricting adult businesses to locations at least 500 feet from a school as a regulation designed to protect children, I see it as standing on a footing different from the balance of the ordinance. The right of the city, a county or the state to enact legislation to protect the welfare of children approaches the plenary. If this ordinance dealt with that subject only, it might well pass constitutional muster. But it is not so limited, and the city has not asked us to treat the provisions relating to schools as severable. Absent a request to do so, I agree with the majority that the entire ordinance may, as to this appeal, be declared unconstitutional.

The second of these propositions is the idea that it is impossible for a city to establish with sufficient certainty before the fact the likelihood of any particular undesirable effect arising out of the location of an adult business. The result of this proposition is to require the city to enact an

ordinance describing one or more effects it wishes to avoid and then to provide some sort of administrative adjudication procedure to permit a showing, after one of these businesses has been set up, that a proscribed effect is occurring or is about to occur. It may be that the majority is correct. On the other hand, it may be possible for a city, in an ordinance properly concerned with effects (as the present one was not), to justify a flat prohibition of such businesses at certain locations because the city's own documented and extensive experience, supported by scientific studies, shows that a particular undesirable and forbidden effect — for example, increased incidence of prostitution — *always* accompanies the establishment of any adult business. While my suspicion is that the majority is right — it can't be done — certainty on the subject is outside my range of expertise (and, I believe, outside the range of expertise of this court). I therefore should have preferred that we announce only that establishing a constitutionally permissible basis for such a flat locational prohibition has not been accomplished here.

**JONES, J.,** specially concurring.

I specially concur in the majority opinion because it keeps faith with what we said in *State v. Henry,* 302 Or 510, 525, 732 P2d 9 (1987), that a local government or state may reasonably regulate the nuisance aspects of adult "material" in "the interests of unwilling viewers, captive audiences, minors and beleaguered neighbors." The majority opinion does not rule out an ordinance which meets minimum constitutional standards.

The City of Portland may have lost this original skirmish to regulate these businesses it considers undesirable, but not the battle against them if it chooses to re-engage. The basic problem with the ordinance is that it is directed to the speech or expression aspects of these businesses rather than to the nuisance created by the businesses. Because the statute is aimed at the wrong target, it shoots wide of the mark.

The ordinance as it is written could apply to practically every neighborhood video rental outlet, although it seems certain that the city does not wish to regulate them in the same fashion. While we sit in isolation, we are not blind to the reality of the present world that a substantial portion of

neighborhood video stores, generally accepted as part of our legitimate urban and suburban business environment, contain "R-rated" video tapes depicting the statute's "specified sexual activity and or nudity." This city ordinance does not distinguish between "R-rated" and "X-rated" materials. Obviously, the drafters of the ordinance were seeking to regulate what is commonly called hard-core pornography, or the so-called "X-rated" materials. However, this ordinance covers not only those materials, but expressions which are seen, heard and are available in virtually every theater, bookstore or video outlet (adult or otherwise) in this state.

If a city chooses to zone out or zone in adult bookstores, or otherwise regulate them, the city can do so by specifying in advance, in the text of the ordinance, the nuisance it intends to eliminate, such as: that these adult bookstores attract prostitutes, pedophiles and other perverts; and that they create health and sanitary problems and the like, thus "beleaguer[ing]" neighbors with a nuisance. The ordinance must address these secondary characteristics of the adult material and not the adult materials themselves. If the problem of adult bookstores persists, the city should have no difficulty demonstrating the objectionable or threatening effect of the operation of such businesses. The city no doubt can document the nuisance effect of "adult" bookstores from its own past experiences.

In sum, the majority opinion is more directive than restrictive. The speech and expression that creates a nuisance can be reasonably regulated in time and place. The City of Portland and any other local government can, if it chooses, regulate adult bookstores.