Argued and submitted July 16, 2001, affirmed May 1, 2002

## Steven E. LEPPANEN,
*Respondent,*

*v.*

## LANE TRANSIT DISTRICT,
a municipal corporation of
the State of Oregon
and a public body, corporate and politic,
*Appellant.*

### 12-00-009315; A111022

45 P3d 501

Rohn M. Roberts argued the cause for appellant. With him on the briefs were Suzanne C. Powell and Arnold Gallagher Saydack Percell & Roberts, P.C.

C. Edward Gerdes, Jr., argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Plaintiff, a City of Eugene resident, attempted to solicit initiative petition signatures at the downtown Eugene transit station. The Lane Transit District (LTD) prohibited him from doing that, invoking an ordinance that, among other things, prohibits solicitation of initiative petition signatures in the vicinity of a bus boarding platform area. Plaintiff then initiated this action challenging the constitutionality of the ordinance, arguing that it violates his right to initiate legislation reserved in Article IV, section 1, of the Oregon Constitution, as well his rights of free expression and free association guaranteed by Article I, section 8, and Article I, section 26, respectively. The trial court concluded that portions of the ordinance violate Article IV, section 1, of the Oregon Constitution, and awarded plaintiff his attorney fees and costs. LTD appeals, assigning error both to the conclusion that the ordinance is unconstitutional and to the award of attorney fees. We affirm, concluding that the ordinance violates the free speech guarantees of Article I, section 8, of the Oregon Constitution. Because we conclude that the ordinance violates that provision of the state constitution, we do not address whether it also violates Article I, section 26, or Article IV, section 1. As for the attorney fees and costs, we conclude that the trial court did not err.

The relevant facts are few and undisputed. LTD is a mass transit district. *See generally* ORS 267.010 to ORS 267.430 (pertaining to mass transit districts). As such, it is a public body, ORS 267.200, authorized to acquire real and personal property, ORS 267.200(2), and to enact ordinances relating to the use of that property, ORS 267.150.

In the 1990s, LTD constructed the Downtown Eugene Station, a central boarding area located on a city block in downtown Eugene designed to move boarding activity away from public sidewalks. To regulate the conduct of people using the new station, LTD adopted Ordinance 36, section 1.15, which provides, in part:

"(23) <u>Solicitation</u>. To ensure the safety, comfort and convenience of District passengers, and the safe and efficient operation of the Transit System:

"(a) No person shall impede or block the free movement of passengers, or otherwise disrupt the function of the District in any District Station or in any District Vehicle;

"(b) No person shall canvass, seek signatures, picket, collect money, solicit sales, or sell or distribute anything of commercial or non-commercial value, on any District Vehicle, within a shelter, on any District Boarding Platform Area, or within eight feet of any District Station doorway or ticket counter, nor otherwise interfere with passenger or public safety[.]"

The "Boarding Platform Areas" of the downtown transit station where canvassing, seeking signatures, and other specified activities are prohibited are designated by a color-coded map that is attached to the ordinance.

Plaintiff is a volunteer signature gatherer. He attempted to solicit initiative petition signatures within a Boarding Platform Area of the downtown station. An LTD representative informed plaintiff that, under section 1.15(23)(b) of the LTD ordinance, he was not permitted to solicit initiative petition signatures within that area. Plaintiff then commenced this action challenging the constitutionality of section 1.15(23)(b) of the ordinance.

After a bench trial, the court issued an opinion concluding that portions of section 1.15(23)(b) are unconstitutional. The trial court noted that, under *Lloyd Corp. v. Whiffen,* 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*),[1] members of the public have the constitutional right reserved by Article IV, section 1, of the Oregon Constitution, to solicit initiative petition signatures in the common areas of a private shopping center, subject to reasonable restrictions. The trial court reasoned that members of the public must have at least the same rights with respect to public property; accordingly, the only question was the reasonableness of the restrictions imposed by section 1.15(23)(b). The court concluded that the

---

[1] The decision commonly is referred to as "*Whiffen II,*" because an earlier decision of the same name, *Lloyd Corporation v. Whiffen,* 307 Or 674, 773 P2d 1294 (1989) (*Whiffen I*), addressed whether "subconstitutional" principles of equity required that the petitioners be allowed to solicit initiative petition signatures on certain private property. *Whiffen I* did not reach the issue of whether the petitioners have the right to engage in that activity on such property under the Oregon Constitution.

prohibition against soliciting initiative petition signatures within eight feet of bus doors while the buses are loading is a reasonable restriction but that, in all other respects, the restrictions on soliciting initiative petition signatures imposed by the ordinance were unreasonable. The court entered judgment for plaintiff.

Plaintiff moved for an award of attorney fees. LTD objected that no applicable statute provided authority for awarding attorney fees. Plaintiff argued that, because he brought the action to vindicate important constitutional rights, the court possessed inherent authority to award the fees. The trial court agreed, concluding that plaintiff brought this action to vindicate important constitutional rights and not personally to benefit financially from a favorable ruling. The court awarded approximately $4,000 in fees and costs.

On appeal, LTD first assigns error to the trial court's ruling that the restrictions of section 1.15(23)(b) on the solicitation of initiative petition signatures violate Article IV, section 1, of the Oregon Constitution. Plaintiff argues that the trial court was correct in concluding that the ordinance violates Article IV, section 1. In the alternative, plaintiff argues that, even if the ordinance does not violate Article IV, section 1, it does violate Article I, sections 8 and 26.

The trial court based its decision on Article IV, section 1, as construed in *Whiffen II*. During the pendency of this appeal, in *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 11 P3d 228 (2000), the Supreme Court overruled *Whiffen II*, thereby casting some doubt on the conclusion that the LTD ordinance violates Article IV, section 1. We need not address that issue, however. In our view, even assuming that the ordinance does not violate Article IV, section 1, it does violate Article I, section 8.

At the outset, we must determine the method of analysis that applies to Article I, section 8. In *State v. Jackson*, 224 Or 337, 356 P2d 495 (1960), the court examined the language and historical context of the adoption of Article I, section 8, and concluded that it was most likely intended to embody the formulation expressed in Blackstone's *Commentaries* that the state may not engage in prior restraint of

publications but may reasonably regulate speech after the fact to preserve public peace and good order. *Id.* at 346-49.

In *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), however, the court adopted a different method of analysis. Under *Robertson*, analysis of the constitutionality of a regulation depends on whether it is aimed at the content of speech or is aimed at forbidden effects that are caused by speech. If the former, then the regulation is unconstitutional unless wholly contained within a well-established historical exception to the protections of Article I, section 8. If the latter, then the regulation is evaluated for overbreadth or on an as-applied basis, depending, respectively, on whether it expressly prohibits speech as a means of regulating the forbidden effect or prohibits the effect caused by speech or otherwise. *Id.* at 412-18. Since *Robertson*, the court has applied that method of interpreting Article I, section 8. As for *Jackson*, the court has declared that the idea that the guarantees of freedom of expression apply only to prior restraint of publications is simply "inadequate." *State v. Henry*, 302 Or 510, 514, 732 P2d 9 (1987).

But then in *Stranahan*, the court declared that the proper method of interpreting *any* provision of the original Oregon Constitution is to ascertain "the intent of the framers * * * and of the people who adopted it," 331 Or at 54 (quoting *Jones v. Hoss*, 132 Or 175, 178, 285 P 205 (1930)), by examining the wording of the provision, the case law surrounding it, and the historical circumstances that led to its creation. *Stranahan*, 331 Or at 56 (citing *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992)). Indeed, in *Stranahan*, the court specifically stated that that method of interpretation applies to Article I, section 8. Certain *amici curiae* had suggested that the court hold that Article I, section 8, confers a right to solicit initiative petition signatures on private property. The court declined to entertain the suggestion, explaining:

> *"Any such analysis would require this court to follow the analytical construct set out in* Priest, *314 Or at 411, because Article I, section 8, is a part of the original constitution. Amici make no attempt to follow that (or any other) methodology, arguing instead for the outcome that they wish to see on policy grounds. * * * Lacking any assistance from*

*amici* in that respect, we decline to undertake on our own an effort to determine whether there is a basis for a different decision under Article I, section 8[.]"

*Stranahan*, 331 Or at 66 n 19 (emphasis added). In the meantime, the Supreme Court has not overruled *Robertson* or any of the cases applying it for the purpose of determining the effect of Article I, section 8.

We conclude that the analytical method set out in *Robertson* controls our evaluation of the parties' Article I, section 8, contentions. Although the Supreme Court has suggested that, because it is part of the original constitution, a different, more originalist, interpretive approach applies to Article I, section 8, the fact remains that the court has yet to overrule *Robertson.* Moreover, as in *Stranahan*, the parties in this case have not argued that anything but the *Robertson* analysis applies. Lacking any assistance from the parties, we decline to undertake on our own an analysis of Article I, section 8, that departs from the method set out in *Robertson*.

Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

As discussed, *Robertson* sets out the applicable method of analysis of Article I, section 8. We recently summarized that analytical approach as follows:

"[*Robertson*] provides the general framework for assessing the constitutionality of legislation in the context of Article I, section 8, challenges. * * * The court identified two types of laws—those aimed at the contents of speech, and those aimed at specific harms, or 'forbidden effects,' that can be caused by speech rather than aimed at the words themselves. Laws aimed at the content of speech violate Article I, section 8, unless the scope of the restraint is wholly confined within some well-established historical exception. The other type of laws, those aimed at 'forbidden effects,' fall into two different categories: (1) where the statute proscribes means of achieving a forbidden effect and those

means include speech or writing, then the court is to determine whether the law reaches privileged communication or whether it can be interpreted to avoid such overbreadth; and (2) where the statute is directed only against causing the forbidden effects, but those forbidden effects may, in fact, be caused by means of language or gestures, the defendant may raise an 'as applied' challenge to the statute."

*City of Eugene v. Lee*, 177 Or App 492, 497, 34 P3d 690 (2001) (citations omitted).

Our first task, therefore, is to determine which of the two broad categories of legislation characterizes section 1.15(23)(b) of the LTD ordinance. Plaintiff argues that the ordinance is aimed at speech. According to plaintiff, it targets speech, based on the content of that speech, in that it does not prohibit all speech within designated bus boarding areas, but only certain types of speech, such as the solicitation of initiative petition signatures. LTD argues that the ordinance is not aimed at speech at all, but rather, is aimed at effects. LTD observes that, as the ordinance states in its opening sentence, the purpose of the regulation is to prohibit activities that would interfere with the "safety, comfort, convenience of District passengers" and with the "safe and efficient operation of the Transit System." Accordingly, LTD argues, the ordinance falls into the second *Robertson* category and must be evaluated for overbreadth only.

Assigning the disputed provision of the LTD ordinance to its proper *Robertson* category requires us to determine its meaning and effect. *See Lee*, 177 Or App at 501 (determining category into which enactment falls requires construing it). In construing section 1.15(23)(b), we find particularly helpful the Supreme Court's decision in *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988). In that case, the disputed local ordinance restricted "adult businesses" within a specified number of feet of residential zones, schools, and other adult businesses. The ordinance included a number of "findings" that recited the history of the city's earlier regulation of sexually oriented businesses and "found" that adult bookstores and theaters are "inherently incompatible" with residential zones for a variety of stated reasons. When the ordinance was challenged as a violation of Article I, section 8, the city argued that it should be evaluated under

the second *Robertson* category, because it regulated only effects, as specified in the history and findings provisions. The court rejected the city's reliance on its findings as a basis for classifying the ordinance as targeting effects only:

> "These 'findings' are vague and conclusory. * * * But the problem is not vagueness or lack of detail in the 'findings.' They do not purport to be findings of adjudicative facts (for which they are plainly inadequate) nor to be regulatory standards. The problem, indeed, is that they, or more concretely defined effects, are *not* part of the regulatory standards. These findings are only a recital of premises for legislation. As such, their vagueness or concreteness and their past or continued accuracy are immaterial. Their omission would not affect the validity of the ordinance. If legislative findings mattered, drafters merely would busy themselves with inserting whatever prefatory recitals courts have quoted in sustaining similar laws. But lawmakers do not need to find or declare the factual predicates for legislation, unless some special statute requires it, and such a recital gains nothing for the validity of the legislation, though it can sometimes help toward its purposeful interpretation. It is the operative text of the legislation, not prefatory findings, that people must obey and that administrators and judges enforce.

> "In short, the problem with the city's asserted 'concern with the effects of speech,' is that the operative text of the ordinance does not specify adverse effects that constitute the 'nuisance' attributable to the sale of 'adult' materials and therefore does not apply only when these adverse effects are shown to occur or imminently threaten to occur."

*Tidyman*, 306 Or at 185. Thus, for a regulation properly to be classified in the second *Robertson* category, its operative provisions must limit the regulation to the effects it is intended to target; it must not regulate a form of speech merely because that form of speech may, in some instances, produce the unwanted effects. *Id.* at 185-86; *see also Robertson*, 293 Or at 416-17 ("laws must focus on proscribing the pursuit or accomplishment of forbidden results rather than on the suppression of speech or writing either as an end in itself or as a means to some other legislative end"); *cf. State v. Stoneman*, 323 Or 536, 546, 920 P2d 535 (1996) (although statute forbidding commerce in child pornography was framed in terms of

prohibited forms of expression, production of the prohibited expression *"necessarily* involves harm to children") (emphasis in original).

We turn to the text of section 1.15(23). It begins with a statement of its purpose: "To ensure the safety, comfort and convenience of District passengers, and the safe and efficient operation of the Transit System[.]" It then follows with its operative provisions—the means selected for carrying out the stated purpose of ensuring public safety, comfort, and convenience—in subsections (a) and (b). Subsection (a) prohibits any person from blocking or impeding the free movement of passenger traffic at any District Station. Subsection (b) provides that no person shall, among other things, "seek signatures" on any District Boarding Platform Area.

In prohibiting the solicitation of initiative petition signatures, subsection (b) certainly prohibits a form of speech; no one contests that much. It also forbids only certain types of speech, based on the content of that speech. It prohibits canvassing and solicitation, but not preaching a religious message, for example. No one contests that much, either. The question is whether the ordinance nevertheless amounts to a regulation only of a forbidden effect. We conclude that it does not.

Subsection (b) does not prohibit seeking signatures only when doing so interferes with public safety, comfort, and convenience. It does not prohibit seeking signatures only when doing so would block or impede the free movement of traffic, and, in any event, subsection (a) already accomplishes that. Subsection (b) prohibits seeking signatures in specified areas *without regard to any effect that engaging in that conduct produces.* It is thus precisely analogous to the ordinance in *Tidyman,* which likewise prohibited speech without linking it to the effect with which the local government was concerned.

Although LTD does not make the argument, we note that, after listing a number of specific activities, subsection (b) does prohibit more generally activities that "otherwise interfere with passenger or public safety." That does not convert the ordinance into a second-category, effects-based regulation, however. The reference "otherwise interfere with

passenger or public safety" is not a limitation on the operation of the preceding prohibitions. It is an example of the fairly common practice of following a list of specifically prohibited conduct with an open-ended, general phrase to *extend* the effect of the prohibition to *other* conduct. *See, e.g., Vannatta v. Keisling*, 324 Or 514, 532-33, 931 P2d 770 (1997) (construing phrase "or other improper conduct").

In a related vein, it could be argued that the reference "otherwise interfere with passenger or public safety" suggests that LTD believes that the conduct specifically prohibited—including soliciting initiative petition signatures— in fact, does interfere with passenger or public safety. That reading also does not convert the ordinance into one prohibiting effects instead of speech, however. As the court explained in *Tidyman*, the fact that the legislative body enacting a regulation *assumes* that a consequence of prohibited speech is a forbidden effect does not mean that the effect itself is the target of the prohibition. To be a second-category, effects-based regulation, it must state as an element of the prohibition itself the forbidden effect. *Tidyman*, 306 Or at 185-86. *Stoneman* is not to the contrary. In that case, the court held that, although the challenged child pornography statute "appears" to have been content-based, an examination of its language and context makes clear that the forbidden effect of harm to children was "necessarily" the focus of the statute. *Stoneman*, 323 Or at 545-46. The same cannot be said of the LTD ordinance at issue in this case.

■ In prohibiting solicitation of initiative petition signatures within any District Platform Area, therefore, section 1.15(23)(b) prohibits speech on the basis of its content. It is an ordinance that falls within the first *Robertson* category. Consequently, unless it is wholly contained within a well-established historical exception to the protections of Article I, section 8, it is unconstitutional. *Robertson*, 293 Or at 412; *see also Henry*, 302 Or at 521. Neither party has identified any well-established historical exception that might apply, and we are not aware of any. Section 1.15(23)(b) therefore cannot survive constitutional scrutiny under Article I, section 8.

■ LTD also assigns error to the trial court's award of attorney fees to plaintiff. It argues that, although the courts

may have inherent authority to award attorney fees in certain cases, this is not one of them, because the judgment benefits only a small group of people, and any benefit to the public at large is indirect, at best. Plaintiff responds that he has received no special benefits; he is a volunteer signature gatherer. Moreover, he argues, the judgment in this case resolves important issues of constitutional magnitude concerning the right of every citizen in the state to collect initiative petition signatures.

In *Deras v. Myers*, 272 Or 47, 65-66, 535 P2d 541 (1975), the Supreme Court explained:

> "[A]s a general rule American courts will not award attorney's fees to the prevailing party absent authorization of statute or contract, * * * [however] courts of equity have the inherent power to award attorney's fees. This power frequently has been exercised in cases where the plaintiff brings suit in a representative capacity and succeeds in protecting the rights of others as much as his own."

More recently, in *Armatta v. Kitzhaber*, 327 Or 250, 287, 959 P2d 49 (1998), the court explained that, for a party to obtain an award of attorney fees under *Deras*, three prerequisites must be satisfied: (1) the proceeding must be one in equity; (2) the party requesting attorney fees must be the prevailing party; and (3) the party requesting attorney fees "must have been seeking to 'vindicat[e] an important constitutional right applying to all citizens without any gain peculiar to himself.'" (Quoting *Dennehy v. City of Gresham*, 314 Or 600, 602, 841 P2d 633 (1992).)

LTD does not dispute that this is a proceeding in equity and that plaintiff was the prevailing party. The sole issue is whether plaintiff satisfied the third *Deras* requirement. In deciding that issue, we are aided by several appellate decisions.

In *Deras* itself, the plaintiff was a former candidate for state representative. He sought a declaration that certain laws that restricted campaign spending were unconstitutional. 272 Or at 49-50. The Supreme Court agreed that the laws at issue were invalid. The court also exercised its power to award attorney fees, explaining that, because the plaintiff's action was in "the interest of the public in preservation

of the individual liberties guaranteed against governmental infringement of the constitution," he should be awarded reasonable attorney fees. *Id.* at 66.

In *Vannatta*, by contrast, two state residents, a political action committee, a nonprofit corporation, and a for-profit corporation filed an original proceeding in the Supreme Court, seeking a declaration that a recently passed ballot measure, providing in part for mandatory limits on contributions to state political campaigns, was unconstitutional in whole or in part. 324 Or at 517. The court declared portions of the measure invalid. *Id.* at 549. The court determined, however, that the petitioners were not entitled to an award of attorney fees. The court explained:

> "It is true that, to some degree, the same 'interest of the public in preservation of the individual liberties guaranteed against governmental infringement of the constitution' on which this court relied in awarding attorney fees in *Deras* is present in this case. That, however, is not enough. *Deras* was a case in which the petitioner was attempting only to vindicate interests of the public at large. By contrast, some of the petitioners, both individual and institutional, who have brought the present proceeding are not so disinterested. Their victory may benefit many members of the public at large, but that is true of virtually any case involving the right to speak, write, or print freely on any subject whatever. The overall benefit to the public is only an ancillary result in this case. Petitioners such as the political action committee and the potential political candidate have individualized and different interests that they seek to vindicate. Under such circumstances, this court ordinarily will decline to exercise its equitable power to award attorney fees."

*Id.* at 548-49 (citation omitted).

In *Armatta*, again by contrast, the plaintiffs challenged the validity of a "victims' rights" initiative. The court determined that the measure was invalid because it had been adopted in a manner that was contrary to the "separate-vote" requirement of Article XVII, section 1, of the Oregon Constitution. 327 Or at 289. As pertinent to an award of attorney fees, the court noted that one of the plaintiffs had alleged that the measure would remove his discretion to assign jail

inmates to "alternative programs," another had alleged that the measure would allow public officials to trespass upon her property, and all of the plaintiffs had alleged that the measure would have an impact on their taxes. *Id.* at 288. The court concluded that those interests were

"not the type of 'individualized,' 'peculiar,' or 'pecuniary' interests that preclude an attorney fee award. * * * [N]one of the plaintiffs in this case stands to gain any particular benefit from a declaration that [the measure] is invalid, other than the benefit that they share with all other citizens in having the Oregon Constitution correctly construed. * * *

"* * * * *

"* * * [I]n filing this action, plaintiffs primarily sought to enforce the provisions of the Oregon Constitution that relate to amendment and revision of that document * * *. Plaintiffs, therefore, sought to benefit all Oregonians, because they sought to defend the integrity of the amendment and initiative processes. That is the type of public benefit that, in our view, makes an award of attorney fees appropriate."

*Id.* at 288-89.

In this case, unlike *Vannatta,* plaintiff stands to reap no individualized, peculiar, or pecuniary gain from the judgment. Instead, as in *Deras* and *Armatta,* he brought this action to vindicate the rights of all citizens subject to the challenged ordinance and their rights to free expression guaranteed by Article I, section 8, of the state constitution. We conclude that the trial court did not err in awarding plaintiff his attorney fees.

Affirmed.